CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED

JUN 0 4 2010

JOHN F. CORCORAN, CLERK
BY: _____
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
HARRISONBURG DIVISION

CLAUDINE NIGRO,                        )
                                       )        Civil Action No. 5:09-CV-00064
        Plaintiff,                     )
                                       )        **MEMORANDUM OPINION**
v.                                     )
                                       )        By: Hon. Glen E. Conrad
VIRGINIA COMMONWEALTH                  )        United States District Judge
UNIVERSITY MEDICAL COLLEGE             )
OF VIRGINIA, et al.,                   )
                                       )
        Defendants.                    )

 

The plaintiff, Claudine Nigro, filed a multiple-count complaint in this court against the defendants, Virginia Commonwealth University Medical College of Virginia ("VCU"), Francis X. Dennehy, Warren Memorial Hospital (the "Hospital"), and Valley Health System ("Valley Health"). The case is presently before the court on the defendants' motions to dismiss the plaintiff's second amended complaint pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure. For the following reasons, the defendants' motions will be granted in part and denied in part.

### Factual and Procedural Background

The following facts, which are taken from the plaintiff's second amended complaint, are accepted as true for purposes of the defendant's motion to dismiss. See Ashcroft v. Iqbal, 556 U.S. ___, 129 S. Ct. 1937, 1950 (2009).

Between July 1, 2008 and June 30, 2009, plaintiff was enrolled in a physician's residency program in family practice as a first-year resident. The residency program, a three-year program, was conducted at Warren Memorial Hospital. Francis Dennehy was the director of the residency

program, and was at all relevant times an employee and faculty member of VCU, as well as an employee of Valley Health and the Hospital. Bret Ripley was the associate director of the residency program and an employee of Valley Health and the Hospital.

The residency program was funded and operated under a contract between Valley Health and VCU (the "VCU Contract"). Nigro alleges that the residency program was conducted in an affiliation with and under the direction of VCU. The VCU Contract mandates that the residency program director and any associate directors meet certain qualifications.

On March 24, 2008, Nigro entered into an agreement with the Hospital to participate in the residency program (the "Nigro Contract"). Plaintiff alleges that the language of the Nigro Contract indicates a right to continue in the program for the full three years absent a finding of a deficiency sufficient to justify dismissal. She also alleges that, pursuant to paragraph 5.0 of the Nigro Contract, VCU would perform any review and assessment of the residents in conformity with certain procedures. The procedures, known as the Shenandoah Valley Family Residency Program Procedures (the "SVFRP Procedures"), govern resident assessment, review, and termination, and are allegedly incorporated into the Nigro Contract.

The plaintiff completed her first year of the residency program, received passing evaluations in each rotation, and received a score above the national average in the in-training exam given by the residency program. Nevertheless, the defendants denied her the right to proceed to her second year of the program. The acts which culminated in the defendants' refusal to let Nigro proceed to her second year are alleged as follows.

As a condition of its accreditation, the defendants were prohibited from requiring residents to work in the hospital in excess of the hour limitations established by the American Counsel for

Graduate Medical Education ("ACGME"). As part of monitoring compliance with ACGME standards, defendants gave Nigro and other residents a confidential survey in early January 2009 issued by ACGME. One question on the survey asked whether residents had ever worked seven consecutive days without one day off. Because the schedule for residents in the residency program was twelve days with one day off, Nigro spoke to Dennehy about this question. Although Dennehy instructed Nigro to provide a false answer, Nigro states that she answered the question truthfully.

Nigro further alleges that on January 10, 2009, she informed an attending physician that she needed to terminate her shift at the Hospital because she was exceeding the ACGME hours limitation. Shortly afterwards, on January 12, 2009, Ripley and a VCU faculty member, at Dennehy's direction, admonished Nigro for this behavior and advised her to continue to work despite being over the limitation.

In March of 2009, the residency program was subjected to inquiries from ACGME relating to violations of the hours limitations. On March 24, 2009, Ripley, again at Dennehy's direction, questioned Nigro about her hours, and Nigro responded that she had worked in excess of the hours limitation.

Plaintiff alleges that the defendants began harassing and retaliating against her for disclosure of the working conditions and her efforts to stay within the hours limitations. On February 25, 2009, Dennehy issued a Letter of Concern which imposed one requirement for corrective action, namely, that she undergo an evaluation by a psychologist. Although the procedures made no provision for letters of concern, Nigro underwent a psychological evaluation, which indicated that Nigro had no mental health disorder that impaired her ability to treat patients.

Nevertheless, on March 25, 2009, defendants issued a Notice of Non-Renewal of Contract which stated that defendants would not permit Nigro to proceed to the second year of the residency program. The notice also stated that plaintiff would receive full credit for one year of the program, and that the only requirement for receiving full credit would be that she successfully complete all rotation requirements. Nigro states that she had passed all rotations as of March 25, 2009, and that her performance was comparable in all relevant ways to other residents in her class.

Nigro appealed the decision of non-renewal to a review subcommittee of four doctors, who were all Associate Clinical Professors at VCU (the "Subcommittee"). After hearing her appeal, the Subcommittee represented to Nigro that it had decided to overturn Dennehy's decision of March 25, 2009, and allow Nigro to continue in the residency program. The Subcommittee, however, did not formulate a new solution or issue a written decision. Rather, Dennehy formulated the new conditions, which were set forth in a memorandum dated April 20, 2009. Under the new conditions, Nigro was placed on probation and required to repeat the first year of residency. Nigro alleges that Dennehy coerced her into signing the April 20 memorandum by threatening to revoke its terms and terminate her participation in the residency program if she did not sign it. Nigro alleges that the April 20 memorandum was issued in retaliation for Nigro's reporting the violations of the ACGME hours limitation and exercising her right to appeal.

Nigro also states that this series of events culminating in the April 20 memorandum reflected the different treatment she received from similarly situated male residents in the residency program. Specifically, Nigro points to a male resident who, despite having an inferior performance record and having engaged in unethical behavior, was permitted to continue to his second year in the residency program. Moreover, whereas Valley Health paid for mental health counseling for the male resident

4

to assist him in coping with stress, the defendants refused to pay for the stress-related counseling she underwent at the defendants' request.

Plaintiff filed a notice of a grievance pursuant to the Valley Health grievance system. She alleges that the defendants then advised Valley Health Human Resources representatives on April 8, 2009, that she was not entitled to file a grievance under the Valley Health grievance system, such that her grievance was not processed. On April 27, 2009, the plaintiff gave notice to the Subcommittee that proper procedures were not followed. The Subcommittee refused to formulate a written decision or recommendation.

On April 27, 2009, Nigro notified the defendants that she believed she was being discriminated against based on gender. Plaintiff alleges she was subject to a harassing environment in retaliation for exercising her rights under the SVFRP Procedures and for giving notice of her claims of discrimination. This harassment included, among other things, excessive monitoring of her activities and misrepresentations regarding her treatment of patients.

On June 25, 2009, Nigro filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC"), setting forth her claim of discrimination based on gender and retaliation. On November 30, 2009, the EEOC informed her via letter that her discrimination claims could be pursued in federal court. Due to the ongoing harassment she suffered, she was forced to leave the residency program on June 30, 2009.

Count I of the second amended complaint alleges breach of contract against Valley Health and VCU. Count II alleges a violation of Due Process pursuant to 42 U.S.C. § 1983 against Dennehy, VCU, Valley Health, and the Hospital. Count III alleges that Dennehy, VCU, Valley Health, and the Hospital deliberately published to the public a series of defamatory statements.

5

Count IV alleges that Dennehy, VCU, the Hospital, and Valley Health engaged in intentional conduct with the specific purpose of inflicting emotional distress. Count V, pleaded in the alternative to Counts I and II, alleges interference with contractual relations by Dennehy. Counts VI and VII allege gender discrimination and retaliation, respectively, against VCU and the Hospital.

The defendants have now filed motions to dismiss the second amended complaint. VCU has raised the defense of Eleventh Amendment immunity. All defendants assert that plaintiff's due process claims, Title VII claims, and state law claims are deficient as a matter of law. The defendants also assert that they are entitled to qualified immunity with respect to plaintiff's constitutional claims. Defendants Dennehy, Valley Health, and the Hospital assert immunity pursuant to the Health Care Quality Improvement Act with respect to the plaintiff's state law claims for damages. The motions having been fully briefed and the parties having appeared before the court for a hearing on these motions, the matter is now ripe for disposition.

**<u>Standard of Review</u>**

The defendants have moved to dismiss the complaint for failure to state a claim on which relief may be granted pursuant to Federal Rule of Civil Procedure 12(b)(6). "The purpose of a Rule 12(b)(6) motion is to test the sufficiency of a complaint[.]" <u>Edwards v. City of Goldsboro</u>, 178 F.3d 231, 243 (4th Cir. 1999). To survive a Rule 12(b)(6) motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'" <u>Iqbal</u>, 556 U.S. at ___, 129 S. Ct. at 1949 (quoting <u>Bell Atlantic Corp. v. Twombly</u>, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." <u>Id.</u> Although "a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed

6

factual allegations," a pleading that merely offers "labels and conclusions," or "a formulaic recitation of the elements of a cause of action will not do." Twombly, 550 U.S. at 555. Likewise, "a complaint [will not] suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancements.'" Iqbal, 556 U.S. at ___, 129 S. Ct. at 1949 (quoting Twombly, 550 U.S. at 557).

The plaintiff in this case has attached the VCU Contract, the Nigro Contract, and the SVFRP Procedures as exhibits to the complaint. The court may properly consider these documents without converting the motion to dismiss to one for summary judgment. See American Chiropractic Ass'n v. Trigon Healthcare, Inc., 367 F.3d 212, 234 (4th Cir. 2004) (holding that a court may consider certain extrinsic evidence in ruling on a 12(b)(6) motion).

### Defendants' Motions to Dismiss

## I.    Eleventh Amendment Immunity

VCU argues that, as an arm of the state, it is immune from suit in federal court pursuant to the Eleventh Amendment to the United States Constitution. The Eleventh Amendment precludes any suit which seeks relief against a sovereign state in federal court unless Congress or the state has waived the state's immunity from such suit. This immunity applies to all claims against the states and their agencies. See Puerto Rico Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc., 506 U.S. 139, 146 (1993) (Eleventh Amendment exception for prospective injunctive relief applies only to state officials).

In this case, defendant VCU is an arm of the state. See Herron v. Va. Commonwealth Univ., 366 F. Supp. 2d 355, 363 (E.D. Va. 2004), aff'd by 116 Fed. Appx. 467 (4th Cir. 2004); Haley v. Va. Commonwealth Univ., 948 F. Supp. 573, 577-78 (E.D. Va. 1996); see also Stewart v. Va.

7

Commonwealth Univ., No. 3:09CV738, 2010 U.S. Dist. LEXIS 27305, at *12-13 (E.D. Va. March 23, 2010).

The Virginia Tort Claims Act does not waive the Commonwealth of Virginia's Eleventh Amendment immunity. McConnell v. Adams, 829 F.2d 1319, 1329 (4th Cir. 1987). Moreover, Congress has not abrogated the states' Eleventh Amendment immunity pursuant to 42 U.S.C. § 1983. Quern v. Jordan, 440 U.S. 332, 345 (1979). As such, VCU is entitled to dismissal of the plaintiff's state law claims and due process claim pursuant to § 1983 on the basis of Eleventh Amendment immunity. However, in enacting Title VII, Congress abrogated the states' Eleventh Amendment immunity. See Fitzpatrick v. Bitzer, 427 U.S. 445, 448-49 (1976). As such, the court will deny VCU's motion to dismiss Counts VI and VII on the basis of Eleventh Amendment immunity.

## II.    Fourteenth Amendment Due Process Claims

The Fourteenth Amendment to the United States Constitution provides that no state "shall ... deprive any person of life, liberty, or property, without due process of law." U.S. Const. Amend. XIV. The Fourteenth Amendment's due process clause contains both a procedural and a substantive component. In evaluating a procedural due process claim, the court must determine whether the plaintiff was deprived of a protected interest, and if so, whether she received the process she was due. Logan v. Zimmerman Brush Co., 455 U.S. 422, 428 (1982). In evaluating a substantive due process claim, the court must determine whether the plaintiff was deprived of a protected interest, and if so, whether the state's actions fell so far beyond the outer limits of legitimate governmental authority that no process could cure the deficiency. Sylvia Dev. Corp. v. Calvert County, 48 F.3d 810, 827 (4th Cir. 1995). Here, Nigro claims that she was deprived of property interests in her

8

continued participation in the residency program, as well as liberty interests in her reputation and in continuation in three-year residency program.

**A.      Property Interests**

For the purposes of procedural due process, property interests are not defined by the Constitution, but stem rather from an independent source such as state law. Bd. of Regents v. Roth, 408 U.S. 564, 577 (1972).  To possess a property interest, a claimant "must have more than an abstract need or desire for it.  He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." Id. at 577.

In this case, the plaintiff has argued that she has both a right to continued employment and to continued enrollment.  These arguments underscore the fact that a medical resident is both a student and an employee.  A medical residency, however, is predominantly an academic endeavor. Other courts have similarly concluded that "the primary purpose of a residency program is not employment or a stipend, but the academic training and the academic certification for successful completion of the program." See Davis v. Mann, 882 F.2d 967, 974 (5th Cir. 1989); see also Shaboon v. Duncan, 252 F.3d 722, 729 (5th Cir. 2001); Halverson v. Univ. of Utah Sch. of Medicine, No. 2:06CV228, 2007 U.S. Dist. LEXIS 72974, at *34 (D. Utah Sept. 28, 2007); Allahverdi v. Regents of Univ. of New Mexico, No. 05-277, 2006 U.S. Dist. LEXIS 27682, at *56-57 (D. N.M. April 25, 2006); Fenje v. Feld, 301 F. Supp. 2d 781, 801 (N.D. Ill. 2003), aff'd by 398 F.3d 620 (7th Cir. 2005).[1]

---

[1] The allegations in this case underscore the conclusion that a medical residency is primarily an academic endeavor. The Hospital entered the VCU Contract so as "to educate and train qualified medical residents." (VCU Contract at 1.)  The residents are required to "[s]uccessfully complete the in-service examination" (Nigro Contract ¶ 3.1) and their performance is evaluated in each rotation.  The fact that Nigro received $50,000 for year one of the program does not alter the fact that she was "enrolled" in a primarily academic endeavor. (Second Amend. Compl. ¶ 1.)

The plaintiff has not pointed to any authority affirmatively establishing that Virginia college students possess a property interest in continued enrollment. See, e.g., Davis v. George Mason Univ., 395 F. Supp. 2d 331, 336 (E.D. Va. 2005) (holding that student had no property interest in continued enrollment), aff'd by 193 Fed. Appx. 248 (4th Cir. 2006); see also Tigrett v. Rector & Visitors of Univ. of Va., 137 F. Supp. 2d 670, 675 (W.D. Va. 2001) (assuming without deciding that student has property interest in continued enrollment); Lewin v. Med. College of Hampton Roads, 910 F. Supp. 1161, 1164 (E.D. Va. 1996) (same).[2]

Turning to the particular circumstances of her case, plaintiff asserts that "[t]he Nigro Contract makes clear that Plaintiff had the right to continue in the residency for the full three years absent a finding of a deficiency sufficient to justify dismissal from the Residency Program." (Second Amend. Compl. ¶ 9.) The court, however, "need not accept the legal conclusions drawn from the facts, and [] need not accept as true unwarranted inferences, unreasonable conclusions, or arguments." Jordan v. Alternative Res. Corp., 458 F.3d 332, 338 (4th Cir. 2006). The court cannot agree with the plaintiff's conclusion that the Nigro Contract provides her with a right to continue in the residency program for three years. The agreement specifically states that "Resident has been appointed as a first-year resident of the Residency Program ("Appointment")" and that "[t]he Term of the Appointment, unless sooner terminated as provided herein, shall be from **July 1, 2008** to **June 30, 2009**." (Nigro Contract ¶ 2.0) (emphasis in original).

---

[2] The plaintiff points to Lewin as having held that a property right to continued enrollment exists in Virginia. The court in that case, however, held that "*[f]or the purpose of disposing of the instant motion,* the Court finds that Plaintiff had a protectible property interest in continued enrollment." Lewin, 910 F. Supp. at 1164 (emphasis added). The Court specifically cited "three cases assuming protected property interest" for this proposition. Id.

Nigro attempts to avoid this clear language by arguing that other provisions of the contract create a right to the full three years of the program. In support of this inference, Nigro points to statements that a resident will be notified in advance "if promotion or reappointment is in jeopardy" or that the program will attempt to provide the resident with notice "[w]hen deciding not to renew Resident's agreement." (Nigro Contract ¶¶ 5.0, 3.7.) She argues that these provisions support the proposition that a failure to reappoint is "unusual or a special situation" and "not the normal course," (Brief in Opp. pp. 19-20), which in turn reveals the parties' intention that a resident accepted to the program will be reappointed each year for three years. Nigro erroneously construes these sections, which specifically outline procedures relevant to non-renewal of the one-year contract, to imply a three-year property interest despite the express language regarding the contract's term. The language used in a contract must be given its ordinary meaning, and if when so read the meaning is plain, the contract must be given effect according to the plain meaning of the words used by the parties. Appalachian Power Co. v. Greater Lynchburg Transit Co., 374 S.E.2d 10, 12 (Va. 1988). Moreover, the court must interpret the contract to give effect to all provisions of the agreement. See Daugherty v. Diment, 385 S.E.2d 572, 574 (Va. 1989). Nigro's interpretation of the contract would render the provisions on the term of appointment meaningless. Consequently, the court finds that Nigro has failed to allege sufficient facts to support the notion that she had a property interest in the three-year residency program for the purposes of procedural due process.[3]

---

[3] In passing, the court notes that Nigro's complaint details a significant amount of process afforded to her, which resulted in the reversal of the non-renewal decision. She received a Letter of Concern on February 25, 2009, prior to the residency program being subjected to inquiries from ACGME. One month later, Nigro received the Notice of Non-Renewal. She then appealed that decision to a Subcommittee, and the decision was reversed by an April 20 memorandum which instead placed Nigro on probation and required her to repeat her first-year rotations.

Finally, to the extent that Nigro alleges a violation of substantive due process, that claim too must fail. "Substantive due process is a far narrower concept than procedural; it is an absolute check on certain governmental actions notwithstanding the fairness of the procedures used to implement them." Love v. Pepersack, 47 F.3d 120, 122 (4th Cir. 1995). Again, however, Nigro has pointed to no authority indicating that students possess a right to continued enrollment in the context of substantive due process. See Regents of Univ. of Mich. v. Ewing, 474 U.S. 214, 222 (1985) (assuming without deciding constitutionally protectible right in continued enrollment); id. at 229-30 (Powell, J., concurring) (stating that the interest in continued enrollment "bears little resemblance to the fundamental interests that previously have been viewed as implicitly protected by the Constitution"); Cobb v. Rector & Visitors of Univ. of Va., 69 F. Supp. 2d 815, 826 (W.D. Va. 1999) (assuming without deciding that protectible interest exists). As such, the plaintiff's substantive due process claim must likewise be dismissed.

**B.      Liberty Interests**

The defendants argue that Nigro has not alleged sufficient facts to state a plausible claim that her separation from the residency program infringed a liberty interest in her reputation. An individual's liberty interest in her reputation is only sufficient "to invoke the procedural protection of the Due Process Clause" if combined with "some more tangible interest[] such as employment." Paul v. Davis, 424 U.S. 693, 701 (1976). To state this type of liberty interest claim, a plaintiff must allege that the charges against her: (1) placed a stigma on her reputation; (2) were made public by the employer; (3) were made in conjunction with her termination or significant demotion; and (4) were false. Sciolino v. City of Newport News, 480 F.3d 642, 646 (4th Cir. 2007).

In the present case, Nigro points to paragraph 78 of her complaint, where she lists specific

defamatory statements, in support of her allegations that the defendants have infringed a liberty

interest in her reputation. Several of the purportedly defamatory statements were made in the

Letter of Concern and the Notice of Non-Renewal, which are alleged to have been issued only to

Nigro. (Second Amend. Compl. ¶¶ 24, 27) ("Dennehy, on behalf of the Defendants, issued a

'Letter of Concern' *to Plaintiff*") ("Defendants issued *to Dr. Nigro* a Notice of Non-Renewal of

Contract") (emphasis added). Other allegedly defamatory statements were made during the

meeting with the Subcommittee to review the non-renewal decision and in an Addendum Note to

Semiannual Performance Review. Finally, Nigro alleges that Bret Ripley and Kathy Kagarise

made statements in emails dated April 3, 2009, to the effect that Nigro had tapped telephones and

recorded conversations.

Nigro's allegations do not state a plausible claim for relief. The statements in the Letter of

Concern and Notice of Non-Renewal are not alleged to have been made public.[4] The statements

made in the meeting with the Subcommittee and the statement in the Addendum Note to Semiannual

performance review also provide insufficient bases for plaintiff's claim. First, most of these

statements are matters of opinion relating to Nigro's performance in an academic program. (Second

Amend. Compl. ¶ 78) ("Plaintiff has poor time management") ("Plaintiff had not shown any

improvement"). Moreover, the statements do not imply any serious character defects such as

dishonesty or immorality which might seriously damage plaintiff's standing in the community or her

---

[4] To the extent that Nigro argues that these statements are now contained in her personnel file, her complaint does not so allege, nor does it allege that there is a likelihood that a prospective employer or the public at large will inspect the file. See Sciolino v. City of Newport News, 480 F.3d 642, 650 (4th Cir. 2007)

freedom to take advantage of other employment opportunities. See Zepp v. Rehrmann, 79 F.3d 381, 388 (4th Cir. 1996). Statements suggesting incompetence or unsatisfactory job performance are not sufficient. Id. It is also not clear that the statements made by Dennehy before the Subcommittee were "made public," as that was an internal proceeding requested by the plaintiff. See Luy v. Baltimore Police Dep't, 326 F. Supp. 2d 682, 690-91 (D. Md. 2004) (statements made public only through internal communications not sufficient). The remaining statements, those in the emails regarding the tapping of phones and recording of conversations, are not alleged to have a connection to Nigro's discharge or significant demotion. Simply put, Nigro has not sufficiently pleaded a plausible claim for deprivation of a liberty interest in her reputation.

In paragraph 72 of her second amended complaint, Nigro seemingly argues that she may assert a liberty interest in continued enrollment in the medical residency program, separate and apart from the interest she enjoys in her good reputation as a physician. Stated differently, the plaintiff attempts to argue that the defendants infringed a liberty interest when they took adverse, and allegedly unnecessary, corrective action. The court concludes as a matter of law that there is no independent, constitutionally protected interest in pursuing a particular area of study or career objective, absent those protected by a property interest or a liberty interest in realizing such career objectives elsewhere without undue stigma or impairment of reputation.[5] Nigro was free to pursue her education at another residency program. See Roth, 408 U.S. at 575 ("It stretches the concept too far to suggest that a person is deprived of 'liberty' when he simply is not rehired in one job but remains as free as before to seek another.") Where, as here, there is no property interest nor stigma

---

[5] See Bd. of Curators of Univ. of Missouri v. Horowitz, 435 U.S. 78, 85 (1978) (whether such a general liberty interest exists is said to be an open question).

or impairment of reputation, such that Nigro could pursue her academic or career objectives elsewhere, no infringement of a constitutionally protected liberty interest exists. Accordingly, the plaintiff's claims for deprivation of liberty interests must be dismissed.

## C.    Qualified Immunity

As the preceding analysis suggests, even if Nigro had an interest in the three-year residency program, the individual defendant would be entitled to qualified immunity. Qualified immunity protects government officials performing discretionary functions from liability for civil damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). The court must "determine whether the plaintiff has alleged the deprivation of an actual constitutional right at all," and, if so, "whether that right was clearly established at the time of the alleged violation." Conn v. Gabbert, 526 U.S. 286, 290 (1999). For a right to be clearly established, "its contours must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." Hope v. Pelzer, 536 U.S. 730, 739 (2002).

The plaintiff has failed to point to any clearly established law in support of her contention that she has a property or liberty interest in continued enrollment in the three-year residency program. Although several decisions assume, for the sake of argument, the existence of such rights, these assumptions do not constitute clearly established law for the purposes of the qualified immunity analysis. Under the facts alleged by Nigro, it is not apparent that the defendants' conduct in this case violated clearly established law. See Harlow, 457 U.S. at 818; Conn, 526 U.S. at 290; Hope, 536 U.S. at 739.

15

## III.    Title VII Claims[6]

## A.    Gender Discrimination

Generally, a plaintiff can establish discrimination under Title VII in one of two ways, either through direct or circumstantial evidence or by proceeding under the burden-shifting framework. See Hill v. Lockheed Martin Logistics Mgmt., 354 F.3d 277, 284-85 (4th Cir. 2004). Under the burden-shifting framework, a plaintiff can establish a prima facie case of intentional discrimination by demonstrating that (1) she is a member of a protected class; (2) she had satisfactory job performance; (3) she suffered adverse employment action; and (4) similarly situated employees outside her class received more favorable treatment. See Holland v. Washington Homes, Inc., 487 F.3d 208, 214 (4th Cir. 2007); White v. BFI Waste Servs., 375 F.3d 288, 295 (4th Cir. 2004). Once the plaintiff does so, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its conduct. Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 253 (1981). If the defendant satisfies this burden, then the presumption of discrimination disappears and the plaintiff must show by a preponderance of the evidence that the employer's proffered reasons were merely a pretext for discrimination. Id.

From a pleading perspective, a plaintiff need not allege "specific facts establishing a prima facie case of discrimination" to survive a motion to dismiss. Swierkiewicz v. Sorema, 534 U.S. 506, 508 (2002). But, as explained, the complaint must contain sufficient factual matter, accepted as true, to state a claim that is plausible on its face. See Iqbal, 556 U.S. at ___, 129 S. Ct. at 1949.

---

[6] VCU argues in its memorandum in support of its motion to dismiss that it had no notice of Nigro's EEOC complaint or her belief that she was being discriminated against. VCU also argues that Nigro was neither a student nor an employee of VCU, and that none of the complained of actions were committed by VCU or agents of VCU. These assertions, however, require further factual development and cannot appropriately be decided on a motion to dismiss.

16

Nigro alleges that she was subjected to disparate treatment because she is female. She alleges several examples of this disparate treatment: (1) she was issued a notice of non-renewal when similarly situated males were not given a notice of non-renewal; (2) she was required to repeat the first year of residency when similarly situated males were not so required; (3) the defendants failed to apply the contract terms and procedures with respect to her in the same manner as they were applied to similarly situated male residents; (4) she was not permitted access to the Valley Health grievance process when similarly situated males were given access to it; and (5) her performance was evaluated differently from similarly situated male residents. (Second Amend. Compl. ¶ 134.)

The defendants argue that Nigro has failed to state a claim because her allegations belie the assertion that she had satisfactory job performance. The defendants argue that her poor performance and personality provided the bases for defendants' actions. The plaintiff, however, has specifically alleged that she "received passing evaluations in each rotation by each doctor that has evaluated her performance" (Second Amend Compl. ¶ 14), that her "overall performance in the Residency Program was comparable in all relevant ways and in some cases superior to, the overall performance of other residents in her class who were allowed to continue in the Residency Program" (Second Amend. Compl. ¶¶ 28, 123), and that she "passed with above average scores in Emergency Medicine and Family Practice" (Second Amend. Compl. ¶ 34).

The defendants also argue that Nigro's allegations fail to demonstrate substantial similarity to the male resident who received more favorable treatment. Defendants argue that she fails to allege that the male resident suffered from the same attitude problems and disinterested appearance, and that the pleadings reflect the fact that the residency program did not have the same concerns

regarding the male resident as those it expressed with regard to Nigro. Nigro's complaint, however, alleges that:

> the Defendant Valley Health paid for mental health counseling for the male resident to assist him in coping with the stress associated with participating in the rigorous Residency Program. The psychologist who evaluated Plaintiff at Defendants' request, informed the Defendants that Plaintiff, like the male resident, was suffering from considerable stress associated with the rigors of the Residency Program and that Plaintiff, like the male resident, would benefit from counseling. Defendants, however, initially refused to provide counseling to Plaintiff, and instead issued the Notice of Non-Renewal. Only after Plaintiff appealed did Defendants agree that Plaintiff should have the counseling, but Defendants refused to pay for the counseling as they did with the male resident.

(Second Amend. Compl. ¶ 36.) Nigro has thus alleged that both she and the male resident were suffering from considerable stress which required mental health counseling. Moreover, Nigro has specifically alleged that, to the extent the April 20 memorandum purported to be based on academic performance, she outperformed the male resident. She alleges that:

> the April 20 Memorandum reflected discriminatory treatment of Plaintiff compared to a male resident in Plaintiff's class who had clearly inferior performance to Plaintiff and was not prohibited from continuing to the second year of the Residency Program. The male resident failed the internal medicine rotation. Additionally, in a Neonatal Intensive Care rotation, Residency Program staff found the same male resident had engaged in unethical behavior consisting of asking charge nurses for answers to questions on a rotation ending test which he knew to be a "closed book" exam. Moreover, his total scores in the rotation evaluations were below those of Plaintiff, and he underperformed compared to Plaintiff in 5 out of 7 rotations.

(Second Amend. Compl. ¶ 35.)

The defendants also argue that Nigro's allegations suggest that she was terminated because of her poor performance, not because of her gender. Again, however, Nigro has specifically alleged that she was performing satisfactorily and that she outperformed a similarly situated male resident who was not terminated. Although Nigro's complaint may suggest other possible reasons for her

18

termination, "the inclusion of those stated reasons in her complaint does not establish at the pleading stage that she is not entitled to relief on her stated discrimination claim." See Ray v. Amelia County Sheriff's Office, 302 Fed. Appx. 209, 212 (4th Cir. Dec. 9, 2008) (unpublished) (reversing district court's dismissal of ADEA claim) (citing Swierkiewicz, 534 U.S. at 512). Viewing the complaint in the light most favorable to Nigro, the court concludes that she has sufficiently pleaded a claim for relief.

**B.      Retaliation**

In order to establish a claim of retaliation, "a plaintiff must show that he opposed an unlawful employment practice or participated in a charge or proceeding under Title VII; that he has suffered an adverse employment action; and that there is a causal connection between the two." Balazs v. Liebenthal, 32 F.3d 151, 158 (4th Cir. 1994).

Nigro's complaint alleges that "[o]n or about April 27, 2009, Plaintiff notified Defendants that she believed she was being discriminated against based upon her gender." (Second Amend. Compl. ¶ 139.) She alleges that the retaliation against her included: "causing a sham evaluation (dated June 4, 2009) to be prepared by the doctors that are the target of the discrimination claim, Dr. Whisenant's excessive monitoring [of] Dr. Nigro's activities and making misrepresentations regarding her treatment of patients, and Dr. Dennehy and Dr. Ripley disseminating on a widespread basis throughout the Hospital Dr. Nigro's decision to challenge the decision of the Program to deny her entry to the second year of residency and otherwise portraying her in a negative light." (Second Amend. Compl. ¶ 141.)

Defendants argue that Nigro's allegations fail to demonstrate that they had knowledge that she was engaged in protected activity before the alleged retaliation, and that as such no inference

of causal connection can be drawn. This argument is based on the assumption that the adverse employment action complained of is the April 20 memorandum. However, as stated above, Nigro alleges that the retaliation for her opposition to an unlawful employment practice took the form of a sham evaluation, excessive monitoring, dissemination of her decision to appeal, and otherwise portraying her in a negative light.

With respect to these specific actions, the defendants argue that they are not materially adverse. The Supreme Court has stated that "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." Burlington N. & Sante Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006) (citations and quotations omitted). The standard of material adversity is important because Title VII does not protect employees from "trivial harms" such as "petty slights" and "minor annoyances." Id.

The court concludes that Nigro's allegations are sufficient at this stage to state a claim for retaliation. In so holding, the court is mindful of the fact that "the significance of any act of retaliation will often depend upon the particular circumstances." See id. at 69. Nigro has alleged that, after notifying the defendants of her claim of discrimination, a sham evaluation was prepared and misrepresentations were made regarding her patient treatment. The court concludes that similar allegations, in certain circumstances, could discourage a reasonable employee from bringing discrimination charges.

## IV.     State Law Claims

### A.     Breach of Contract

To state a claim for breach of contract, a plaintiff must allege (1) a legal obligation of the

20

defendant to the plaintiff, (2) a violation or breach of that right or duty, and (3) a consequential injury or damages to the plaintiff. Brown v. Harms, 467 S.E.2d 805, 807 (Va. 1996).

Nigro claims that the defendants breached the Nigro Contract by denying her the right to continue in the residency program. As the court has previously concluded, however, the Nigro Contract appointed Nigro as a first-year resident only, and did not provide her with a right to continue in the program beyond the first year.

Nigro also claims that the defendants breached the Nigro Contract by issuing the Notice of Non-Renewal in violation of the procedures, by permitting Dennehy to issue the April 20 memorandum, and by denying her access to the Valley Health grievance process. These claims appear to be premised on Nigro's contention that the Nigro Contract incorporates the SVFRP Procedures, and that she has a contractual right to the application of those procedures.

Although Nigro argues that this procedural framework is incorporated, the Nigro Contract makes no clear reference to the SVFRP Procedures which Nigro attached to her complaint. In order to incorporate an extrinsic document, the underlying document must clearly refer to that document, the identity of which is readily ascertainable. See Hertz Corp. v. Zurich Amer. Ins. Co., 496 F. Supp. 2d 668, 675 (E.D. Va. 2007).

The plaintiff argues that the Nigro Contract incorporates the SVFRP Procedures by virtue of several clauses which refer to procedures. These clauses are recited in the section outlining Nigro's duties and responsibilities, and state in pertinent part:

> 3.2      ... Further, Resident shall devote his/her full time and effort in carrying out this Appointment and shall do so in accordance with all applicable standards, including: (i) Residency Program policies and procedures; (ii) Hospital and WMC Medical Staff Bylaws; (iii) the Rules and Regulations of the Medical Staffs; (iv) the Joint Commission on Accreditation of Healthcare Organizations; (v)

standards, requirements and recommendations of all other entities which accredit, regulate or license the Hospital and its programs and the Program, including, without limitation, ACGME and/or AOA; and (vi) applicable federal, state and local laws and regulations.

...

3.6     Resident acknowledges that he/she has received information regarding the Resident Evaluation Policy, Semiannual Performance Review Policy, and Procedure for Deficiencies.

...

3.8     Resident acknowledges that he/she has received information regarding the Grievance Policy of the Residency Program.

(Nigro Contract ¶¶ 3.2, 3.6, 3.8.) In the latter two clauses, Nigro merely acknowledged that she received information regarding various policies of the residency program. With respect to paragraph 3.2, Nigro agreed to conform her conduct to certain standards, including federal, state, and local law, as well as internal policies adopted by the residency program. This clause hardly serves to incorporate the SVFRP Procedures into the Nigro Contract. Even if it did, however, these procedures are referenced with respect to Nigro's responsibilities, not the defendants' responsibilities. Stated differently, Nigro agreed to be bound by these procedures, whereas the defendants did not.

Nigro also points to paragraph 5.0 of the Nigro Contract, which states that:

The Residency has a procedure whereby any Resident terminated by the Residency for deficiencies in Clinical Competence, Technical Skills, and/or Professional Behaviors is granted due process.
   Residents will be notified at least four months in advance through the winter semi-annual review process if promotion or reappointment is in jeopardy, unless behavior preventing promotion or reappointment occurs during the four months prior to the start of each academic year.

(Nigro Contract ¶ 5.0.) Again, this clause does not clearly refer to the SVFRP Procedures such that they are incorporated and binding upon the defendants. Moreover, the Nigro Contract specifically states that:

22

> This agreement contains the final and entire agreement between the parties, and they shall not be bound by any terms, conditions, statements or representations, oral or written, not herein contained or contained in a written amendment of this Agreement executed by the parties hereto.

(Nigro Contract ¶ 14.0.)

In short, Nigro has failed to allege that the defendants breached the Nigro Contract. Her factual allegations do not support the existence of a right to continue in the residency program beyond her first year, nor the incorporation of procedures which are binding upon the defendants. Because she has failed to state a claim, the court will grant the defendants' motion to dismiss with respect to Count I.

## B.    Defamation

To establish a defamation claim under Virginia law, a plaintiff must show "(1) publication of (2) an actionable statement with (3) the requisite intent." Jordan v. Kollman, 612 S.E.2d 203, 206 (Va. 2005). To be actionable, a statement must not only be false, it must also be defamatory. Id. A statement is defamatory if it "tend[s] so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him." Chapin v. Knight-Ridder, Inc., 993 F.2d 1087, 1092 (4th Cir. 1993). "[D]efamatory words are those that make the plaintiff appear odious, infamous, or ridiculous. Merely offensive or unpleasant statements are not defamatory." Id. A statement is per se defamatory if, among other things, it imputes an unfitness to perform the duties of a job or a lack of integrity in the performance of duties, or prejudices the party in her profession or trade. Yeagle v. Collegiate Times, 497 S.E.2d 136, 138 (Va. 1998).

23

The defendants argue that Nigro's claim for defamation, based on twelve statements, must be dismissed because each statement is not actionable. The issue of whether a statement is actionable is a matter of law to be determined by the court. Yeagle, 497 S.E.2d at 138.

Certain types of statements are not actionable. For example, statements of opinion are generally not actionable because they cannot be objectively characterized as true or false. Jordan, 612 S.E.2d at 206; Fuste v. Riverside Healthcare Assoc., 575 S.E.2d 858, 861 (Va. 2003). Statements of opinion are "relative in nature and depend largely upon the speaker's viewpoint," whereas statements of fact are those which are "capable of being proven true or false." Fuste, 575 S.E.2d at 861-62. The Supreme Court of Virginia has stated that, "[i]n determining whether a statement is one of fact or opinion, a court may not isolate one portion of the statement at issue from another portion of the statement. Rather, a court must consider the statement as a whole." Hyland v. Raytheon Tech. Servs. Co., 670 S.E.2d 746, 751 (Va. 2009). Thus, although portions of a statement may be a matter of opinion, if the whole is subject to empirical proof, then a statement may be actionable. Hyland, 670 S.E.2d at 749.

In the present case, statements that plaintiff "had not shown any improvement;" "on a regular basis would leave the Clinic to go home early;" evidenced "no change in apathetic/disinterested approach or demonstrated interest in learning;" had "poor time management with respect to internal medicine rotation;" "failed NICU [Neonatal Intensive Care rotation];" showed "no evidence of improvement or intention to improve in weak areas;" and "was more interested in getting tasks done in order to leave than in caring for the medical issues presented," are not actionable. These statements are either not sufficiently harmful to be defamatory, or are statements of opinion, or both. See, e.g., Jafari v. Old Dominion Transit Mgmt. Co., No. 3:08-CV-

629, 2008 U.S. Dist. LEXIS 97037, at *32 (E.D. Va. Nov. 28, 2008) (statement at employee's discharge meeting that his "skills as a supervisor have diminished to the point that we have to let you go" is not actionable because it is a statement of opinion "relative in nature and depending largely upon the employer's viewpoint"); Am. Commons. Network, Inc. v. Williams, 568 S.E.2d 683, 686 (Va. 2002) (statement that "American Communications Network replaced the management team of ACN Energy due to its failure to establish effective operations" is a matter of opinion); see also Chapin, 993 F.2d at 1092; Yeagle, 497 S.E.2d at 138. Moreover, as the court has previously observed, the allegations in the complaint state that the Letter of Concern and Notice of Non-Renewal were issued to Nigro. There are no factual allegations suggesting that these documents were published to anyone other than Nigro.

Although these statements thus do not state a plausible claim for relief, the court concludes that the statements that Nigro "tapped telephones" and "recorded conversations" on Valley Health property are not statements of opinion, and thus at this stage state a claim for relief.[7] Nigro alleges that these statements were made by Bret Ripley and Kathy Kagarise, while in the course of their agency or employment with defendants Valley Health and the Hospital.

Defendants argue that the statements are privileged because the statements were "made between persons on a subject in which the persons have an interest or duty." See Larimore v. Blaylock, 528 S.E.2d 119, 121 (Va. 2000). To overcome the privilege, a plaintiff must establish that the communication was "inspired by malice." Id. Nigro has specifically alleged that the defendants made the statements out of "hatred, ill will, or a desire to hurt the plaintiff." (Second Amend.

---

[7] The court reiterates that, although at this stage of the proceedings the "e-mail" statements state a claim for defamation, those statements are not alleged to have a connection to Nigro's discharge or significant demotion, and thus do not state a claim for deprivation of a liberty interest.

Compl. ¶ 81.) At this stage, the allegations sufficiently describe malice to overcome the qualified privilege with regard to the remaining defamation claims against Valley Health and the Hospital arising from the "e-mail" statements.

## C.    Intentional Infliction of Emotional Distress

In order to establish intentional infliction of emotional distress under Virginia law, a plaintiff must show that: (1) the wrongdoer's conduct was intentional and reckless; (2) the conduct was outrageous and intolerable; (3) the alleged wrongful conduct and emotional distress were causally connected; and (4) the emotional distress was severe. Womack v. Eldridge, 210 S.E.2d 145, 148 (Va. 1974). If these four elements are shown, a cause of action will lie for emotional distress, unaccompanied by physical injury. Id. The defendants argue that Nigro's claim must be dismissed because she has failed to allege outrageous conduct and severe distress.

The issue of whether conduct may be regarded as so extreme or outrageous as to permit recovery is a matter of law to be decided by the court unless reasonable persons could differ. Id. The Supreme Court of Virginia has stated that a defendant may be liable for intentional infliction of emotional distress "only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." Russo v. White, 400 S.E.2d 160, 162 (Va. 1991). The Court has also stated that "the term 'outrageous' does not objectively describe an act or series of acts; rather, it represents an evaluation of behavior." Id.

Nigro's allegations of outrageous conduct include assertions that the defendants: knew the defamatory statements made against her were false; knew that she was suffering from "a temporary condition which may cause her to appear withdrawn from time-to-time which was associated with

26

the considerable stress placed on her by the rigors of the Residency Program;" knew that Dr. Medcalf, who performed the psychological evaluation, recommended that plaintiff should receive counseling to alleviate symptoms and also recommended that defendants not speculate as to plaintiff's commitment to the profession; "refused to provide counseling and continued to question [her] commitment to medicine and patient care;" issued a Notice of Non-Renewal after receiving Dr. Medcalf's report; told the Subcommittee that plaintiff's demeanor was evidence of a lack of commitment to the practice of medicine; and threatened her with termination and engaged in other retaliatory conduct. (Second Amend. Compl. ¶¶ 91-102.)

The court concludes that such behavior could not be regarded as such "outrageous" and "intolerable" conduct as to state a claim for intentional infliction of emotional distress under Virginia law. All of these alleged statements and actions were made in the course of defendants' supervision of plaintiff in a medical residency program, in which assessments of plaintiff's performance were to be expected. Nigro points out that she has alleged that defendants engaged in deceitful conduct and that they falsely accused her of tapping telephones and recording conversations, which could imply the commission of a crime. The mere accusation of a crime, however, fails to demonstrate outrageous conduct. See Warner v. Buck Creek Nursery, Inc., 149 F. Supp. 2d 246, 252 (W.D. Va. 2001) (holding that, while allegations of theft show that defendants engaged in unacceptable conduct, they fail to support a claim of outrageous conduct). Moreover, Nigro's allegations that defendants made defamatory statements, refused to provide her with counseling, and threatened her with termination, do not suggest conduct which is "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency." See Russo, 400 S.E.2d at 162. Such behavior simply does not rise to that level of deceitful conduct that has

27

been held to state a claim of intentional infliction of emotional distress. Compare Sanford v. Virginia, No. 3:08-CV-835, 2009 U.S. Dist. LEXIS 65186, at *4 (E.D. Va. July 28, 2009) (allegations that hospital staff caused death of a loved one, prevented the family from examining the body, and lied about the circumstances surrounding the death sufficient); Almy v. Grisham, 639 S.E.2d 182, 184 (Va. 2007) (allegations that defendants obtained plaintiff's daughter's confidential medical records without permission, caused a handwriting analyst to issue a false report, and caused a police detective to confront the plaintiff by providing him with false information sufficient).

Relying on the Fourth Circuit's decision in Baird v. Rose, Nigro argues that the defendants' behavior rises to the level of "outrageous conduct" given the defendants' knowledge that she suffered from a stress-related emotional disorder. Nigro's reliance on Baird is unavailing. In that case, a seventh grade student was diagnosed as suffering from "severe depression" and had attempted suicide. 192 F.3d 462, 465-66 (4th Cir. 1999). The Fourth Circuit held that allegations that the plaintiff's teacher, with knowledge of plaintiff's severe depression, intentionally attempted to humiliate her in class were sufficient to state a claim. The plaintiff in that case, however, unlike Nigro, was a minor suffering from severe depression. In the present case, the psychologist found that Nigro was not suffering from depression. Nigro has alleged only that she suffered from a "temporary condition which may cause her to appear withdrawn from time-to-time" and which was related to stress associated with the residency program. (Second Amend. Compl. ¶ 93.) The facts of Baird are simply not apposite to Nigro's situation.

## D.     Intentional Interference with Contract

Nigro alleges that Dennehy "interfere[d] with and obstruct[ed] the Nigro Contract" and asserts a claim against him for interference with contractual relations. She claims that, as a result

of Dennehy's actions, she was issued the Notice of Non-Renewal and the April 20 memorandum.

To succeed on a claim for tortious interference, a plaintiff must show (1) the existence of a valid contractual relationship or business expectancy, (2) knowledge of the relationship or expectancy on the part of the defendant, (3) intentional interference inducing or causing a breach or termination of the relationship or expectancy, and (4) resultant damage to the party whose relationship or expectancy has been disrupted. Duggin v. Adams, 360 S.E.2d 832, 835 (Va. 1987). In contracts terminable at will and contract expectancies, the plaintiff must also show that the defendant employed improper methods. Id.; see also Maximus, Inc. v. Lockheed Info. Mgmt. Sys. Co., 493 S.E.2d 375, 378 (Va. 1997).

As the court has already concluded, however, the Nigro Contract provided plaintiff with the right to continue in the residency program for only one year. She completed that year, pursuant to her contract. To the extent that she argues that Dennehy interfered with a contract expectancy to the remaining two years in the residency program, that claim must fail. A contract expectancy means "a contract that was expected to come into force in the future." T.G. Slater & Son, Inc. v. Donald P. & Patricia A. Brennan LLC, 385 F.3d 836, 845 (4th Cir. 2004); see also Cominelli v. Rector & Visitors of Univ. of Va., 589 F.Supp.2d 706, 716 (W.D. Va. 2008) (contract expectancy alleged where plaintiff was invited to sign an employment agreement which was later withdrawn after defendant published certain information); Maximus, 493 S.E.2d at 378 (agency issued notice of intent to award a contract to plaintiff, which was later canceled after defendant published written protest to the notice). Here, Nigro has failed to allege either a contract or a contract expectancy with regard to her continuation in the residency program. For this reason, the court will grant the defendants' motion to dismiss Count V.

29

## V.     Health Care Quality Improvement Act

The Health Care Quality Improvement Act, 42 U.S.C. § 11111, et seq., ("HCQIA") provides a "professional review body" taking a "professional review action" with immunity from suits for damages in certain circumstances. The entities protected under the HCQIA include the professional review body, any person acting as a member or staff to the body, any person under contract or agreement with the body, and any person who participates with or assists the body with respect to the action. 42 U.S.C. § 11111(a)(1).

The defendants argue that HCQIA grants immunity from liability in this case. HCQIA does not bar suit for claims brought pursuant to the Civil Rights Act and, consequently, the issue of HCQIA immunity is only pertinent as to the remaining portion of plaintiff's state law claim for damages for defamation against Valley Health and the Hospital. As to the claims of defamation that the court has found to survive defendants' motions to dismiss, it is unclear whether the accused statements of Ripley and Kagarise were made in the context of a "professional review action." The court is unable to conclude at this stage in the proceedings whether the defendants are entitled to HCQIA immunity with respect to this remaining portion of plaintiff's defamation claim. The court will therefore deny the defendants' motion to dismiss on the basis of HCQIA immunity at this time.

### Conclusion

For the foregoing reasons, the court will grant in part and deny in part the defendants' motions to dismiss the second amended complaint. The court will grant the defendants' motions to dismiss with respect to Counts I, II, IV and V for failure to state a claim. Further, the court will dismiss VCU as a party to Count III pursuant to the Eleventh Amendment. Finally, as defendant Dennehy is no longer implicated in any of the remaining claims, he shall be dismissed

as a party to this action. Count III shall proceed as to Valley Health and the Hospital. Counts VI and VII shall proceed against VCU and the Hospital.

The Clerk is directed to send a certified copy of this memorandum opinion and the accompanying order to all counsel of record.

**ENTER**: This __4th__ day of June, 2010.

_____
United States District Judge