CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED for Harrisonburg

NOV 23 2010

JULIA C. DUDLEY, CLERK
BY: ~~~~~
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
HARRISONBURG DIVISION

CLAUDINE NIGRO,                     )
                                    )
        Plaintiff,                  )        Civil Action No. 5:09-CV-00064
                                    )
v.                                  )        **MEMORANDUM OPINION**
                                    )
VIRGINIA COMMONWEALTH               )        By: Hon. Glen E. Conrad
UNIVERSITY MEDICAL COLLEGE          )        Chief United States District Judge
OF VIRGINIA, et al.,                )
                                    )
        Defendants.                 )

The plaintiff, Claudine Nigro, M.D., a former medical resident in the Shenandoah Valley

Family Practice Residency Program (the "Program"), filed this action against several of the

Program's faculty members and its affiliates on August 3, 2009, following Nigro's separation

from the Program. After the court ruled on motions to dismiss, the following claims remained:

Nigro's claims of gender discrimination and retaliation under Title VII of the Civil Rights Act

and her supplemental state law claim of defamation.[1] The case is presently before the court on

the remaining defendants' motions for summary judgment and Nigro's motion to strike the

defendants' proffered expert witness. For the reasons set forth below, the motions for summary

judgment will be granted and Nigro's motion to strike the defendants' expert witness will be

denied as moot.

### Statement of the Facts

For purposes of summary judgment, the facts are presented in the light most favorable to

the non-moving party. Terry's Floor Fashions, Inc. v. Burlington Indus., Inc., 763 F.2d 604, 610

(4th Cir. 1985).

---

[1] The court dismissed Nigro's due process claim under 42 U.S.C. § 1983, as well as her state law claims for
breach of contract, intentional infliction of emotional distress, and interference with contractual relations.

The Program was and is conducted at several hospitals in the vicinity of Front Royal, Virginia, including Warren Memorial Hospital (the "Hospital"), and is affiliated with Virginia Commonwealth University / Medical College of Virginia ("VCU") and Appalachian Osteopathic Postgraduate Training Institute Consortium ("A-Optic").[2] Defendant Valley Health System ("Valley Health") owns and operates the Hospital.

The Program is a three-year residency and has a total enrollment of approximately sixteen residents, with roughly five residents in each of the three classes. Over the history of the Program, approximately half of its residents have been women. Dr. Frank Dennehy is the Director of the Program. Dr. Dennehy, along with the Program's Associate Director, Dr. Bret Ripley, and the members of the Program's Core Faculty (the "faculty"), are primarily responsible for the evaluation and training of the residents enrolled in the Program.

The Program enters into one-year contracts with its residents, which are renewed for each successive year of the Program if the faculty deems the resident to be making satisfactory progress. Because the purpose of the Program is to mold medical students into practicing physicians, the duties and responsibilities of a resident in the Program increase with each year. The criteria for promotion between each year of the residency are detailed in the Program's Performance Criteria and Procedures publication (the "Procedures") and are based on the general competencies required of medical residents by the Accreditation Council for Graduate Medical Education ("ACGME"). The six areas of competency used to evaluate the residents in the Program are as follows: patient care, medical knowledge, interpersonal and communication skills, professionalism, systems-based practice, practice-based learning and improvement, and

---

[2]A-Optic was voluntarily dismissed as a defendant by Nigro on November 30, 2009.

osteopathic philosophy and osteopathic manipulative medicine. Additionally, "the R-1 resident must be judged competent to act semi-independently in order to be promoted to R-2." (VCU M.S.J. Ex. B.)

The Procedures provide that "[t]he decision to promote a resident from R-1 to R-2, R-2 to R-3 and R-3 to graduate shall be determined by the Residency Director with input from the faculty." (VCU M.S.J. Ex. B.) All residents are evaluated by their attending physicians with regards to their performance in each of their rotations. Based on these evaluations and on evaluations by the members of the faculty, each resident receives a semiannual review followed by an individual improvement plan ("IIP") that describes strategies for improving his or her performance. Residents are expected to comply with the individual improvement plan that is crafted for them. When residents are deficient in the various competencies required in the Program, they are potentially subject to either discipline or non-renewal of contract.

The Procedures spell out the requisite course of action regarding discipline of residents in the Program and provide that a resident who is warned of deficiencies in the relevant areas of competency and fails to make adequate improvement shall be placed on probation. Further, the Residency Director is required to notify the resident of the specific deficiencies in order that the resident may have an opportunity to remedy them. If the resident continues to be deficient, the Director must notify the resident in writing and then give the resident five working days to respond before recommending that the resident's contract be non-renewed. Residents are permitted to appeal any disciplinary decision to the Graduate Medical Education Committee ("GME"), an entity that is comprised of Valley Health employees and which is responsible for the oversight of the residency program. The GME appeals subcommittee is "free to uphold or

3

reject the Residency Director's recommendation, or to formulate a new solution," but must submit a final recommendation in writing. (VCU M.S.J. Ex. B.)

Nigro was a resident in the Program between July 1, 2008 and June 30, 2009. She passed each of her rotations during her R-1 year, and her initial evaluations were quite positive. Dr. Judith Wheat's August 5, 2008, evaluation of Nigro's participation in the Family Practice Clinic rotation, for example, praised her for being "intellectually curious" and opined that she was "well prepared to handle behavioral medicine beyond the R-1 level at this time." (Dkt. No. 121-6.) Similarly, Wheat rated Nigro in her semiannual resident review for the period ending on December 1, 2008 as "above average" in the category "accepts feedback and uses it for self-improvement" as well as in "self-directed learning style." (Dkt. No. 121-7.) Each of Nigro's evaluations for this period rated her as "average" or "above average" in each of the relevant competency categories.

As Nigro's R-1 year progressed, however, she began to receive increased criticism of her performance from attending physicians and evaluators who observed that she exhibited increased fatigue, apathy, and a lack of desire in investing the time and energy required for continued success in the Program. Dr. Sherry Whisenant, Nigro's advisor, rated her progress in December 1, 2008, as "below average" in several areas related to technical expertise and noted that, although Nigro was "eager to learn," she seemed to "perseverate about certain answers and tries to prove her way is right." (Dkt. No. 121-13.) Although many of Nigro's evaluations continued to rate her favorably, others cited problems with her poor work ethic, her dismissive attitude toward nursing staff, her apparent lack of motivation or desire to facilitate quality patient care or learn medical techniques, and her continuing commission of mistakes after repeatedly being trained

how to properly perform the relevant procedures. In fact, Dr. Lee's January 3, 2009, evaluation

for Nigro's Neonatal Intensive Care Unit ("NICU") rotation stated that the NICU attending

physicians considered failing Nigro for that rotation but for the fact that they did not want her

repeating her patient care problems, staff interaction issues, and technical errors in their unit

again. Lee observed that Nigro's fundamental deficiency was her lack of an "inherent desire to do

well and succeed in medicine." (Dkt. No. 121-103.) In Lee's opinion, Nigro "met the barest

minimum to this rotation[,] but I do not believe she will be able to survive internship and/or

residency without a change in her inner drive." (Dkt. No. 121-103.) Another NICU evaluation

stressed the attending physician's alarm at Nigro's repeated attribution of "all of the issues I

discussed with her to someone else's responsibility." (Dkt. No. 121-24.)

In January of 2009, Nigro met with Whisenant for her semiannual performance review.

During this review, Whisenant informed Nigro that, although her overall performance was

deemed average by most members of the faculty, several of her evaluations had raised significant

concerns. Whisenant also told Nigro that several faculty members and staff had stated that Nigro

made repeated mistakes and gave the appearance of not caring about providing patient care as

much as simply getting tasks accomplished. Nigro denied that anything was wrong with her

progress or performance, and stated that the negative evaluations were a product of favoritism.

On February 4, 2009, Dennehy met with Nigro to discuss her semiannual performance

review. During this meeting, Dennehy spoke with Nigro about the complaints arising from

several of her rotations and her colleagues, which indicated a perceived lack of motivation and

interest in practicing medicine. Dennehy then suggested to Nigro an individual improvement plan

that required Nigro to make efforts to demonstrate empathy to her patients and colleagues. The

plan also required her to meet at the Program's expense with a psychologist to determine whether she had a treatable reason—such as clinical depression or a motivational disorder—for her performance deficiencies. Preferring to talk with her pastor instead of a psychologist, Nigro told Dennehy that she did not want to pursue counseling. She also denied that she was depressed, that she lacked empathy, or that there was any problem with her motivation or interest in the practice of medicine. In order to give Nigro time to consider the matter, Dennehy scheduled a follow-up meeting with Nigro for the end of February. Still, in his February 4 summation of the performance review, Dennehy wrote that "[b]ased on her statements and her largely satisfactory progress thus far, it is expected that[,] barring unforeseen circumstances, she is likely to be promoted to R-2 at the end of June." (Dkt. No. 121-113.)

After the initial performance review, Dennehy discussed Nigro's performance with Whisenant, who informed him that Nigro, when confronted with the concerns regarding her performance, had denied that she was in any way deficient and had blamed her poor evaluations on her colleagues. Dennehy also received reports[3] from the faculty in charge of Nigro's Obstetrics rotations that they were dealing with the same issues as were noted by the NICU faculty; namely, the lack of fundamental medical skills and an apparent disinterest in making the efforts to learn proper techniques, even after repeated instruction. The Family Practice Clinic faculty also informed Dennehy at this point that Nigro demonstrated similar technical deficiencies, including repeatedly pulling the speculum out in an open position when performing PAP smears—causing significant pain to patients—despite having received corrective instruction

---

[3]Contrary to Nigro's assertions, the affidavits referencing these reports do not do so in order to establish their truth. The reports may well have been erroneous or false; the relevant point, however, is simply that they were made and influenced the faculty's subsequent actions. Thus, the affidavits' references to the reports are not hearsay. See FED. R. EVID. 801(c). See also infra note 6.

on this procedure in medical school, during residency orientation, and in each of the Family Practice Clinic's weekly sessions. The faculty also told Dennehy that Nigro had demonstrated an inability to use a microscope for basic fluid exams or to perform procedures that are basic to obstetrics and neonatal resuscitation. On February 6, 2009, Dennehy added an addendum to Nigro's performance review reflecting an increased concern based on his receipt of these comments, observing, "[o]ur greatest concern is the denial that there is anything wrong, when evaluations come from so many levels and so many angles." (Dkt. No. 121-113.)

The follow-up meeting to Nigro's performance review occurred on February 25, 2009. At this meeting, Dennehy gave Nigro a "letter of concern" in which he detailed examples of the issues that had led Nigro's evaluators to believe that she lacked a motivation to provide proper patient care, including "[m]aking the same mistakes repeatedly, after corrective instruction," "[d]oing the minimum to get by," "[n]ot doing the additional [patient] care item[s] needed for good care," "[n]ot looking up the additional needed information for good care of the patient," and "[d]emonstrating to attendings only sporadic medical knowledge study." (VCU M.S.J. Ex. C.) The letter observed that Nigro had not remedied these concerns after they were brought to her notice during her semiannual review and noted that her failure to agree to the individual improvement plan indicated a disinterest in improving her abilities in the areas in which her performance was deemed to be unsatisfactory by the faculty. Accordingly, the letter warned her that if she did not undergo an evaluation with a professional psychologist, her failure "will serve as evidence of resistance to needed improvement" which could lead to probation or non-renewal of her contract after her R-1 year ended. (VCU M.S.J. Ex. C.) Moreover, her failure to demonstrate improvement in the other deficiencies noted in the letter "may also lead to the same"

forms of disciplinary action or termination. (VCU M.S.J. Ex. C.)

Faced with the letter of concern, Nigro agreed to undergo professional counseling with the psychologist, Dr. Medcalf. Before Dr. Medcalf gave the faculty his opinion, however, the Program faculty met on March 18, 2009. After discussing the fact that the Program had been recently reported as violating ACGME limitations on the amount of duty hours that a medical resident was permitted to work,[4] the faculty turned to the question of whether Nigro had demonstrated any improvement. The meeting minutes reflect that "[n]o faculty said they have seen any sign of improvement." (Dkt. No. 121-104.) After further discussion, and after receiving input from Nigro's pod nurse, Dennehy "asked each member of the faculty for their opinion on whether we should not renew Dr. Nigro's contract and let her go. Every member of the faculty stated they feel Dr. Nigro should be let go and not promoted to a second year position." (Dkt. No. 121-104.)

On March 24, 2009, Nigro's psychologist emailed Dennehy, saying that he did not know whether she had a motivational issue. His opinion was that Nigro's apparent apathy did not result from any depression but was instead a product of her attempt to cope with the rigors of the Program. Although Nigro had been diagnosed with ADHD and a possible learning deficiency earlier in her R-1 year, she did not tell Medcalf or the Program about either of these diagnoses. (Nigro Dep. at 80-86.)

---

[4]According to Nigro, in January, she had asked Dennehy for advice in filling out the ACGME survey because a truthful response would necessitate a report that her schedule required her to work hours in violation of ACGME standards. (Complaint at ¶ 18.) The faculty also received notice of Nigro's adherence to the ACGME hours limitations when Nigro terminated her shift later in January, informing her attending physicians that she had to do so in order to comply with ACGME standards. Ripley later allegedly admonished her for refusing to work in excess of the work hour limitations. (Complaint at ¶¶ 20-23.)

On March 25, 2009, Dennehy, Whisenant, and the Program's chief resident notified Nigro that her contract would not be renewed. In the letter to Nigro that explained the faculty's decision, Dennehy stated that Nigro had evidenced no improvement or intention to improve her performance in the areas noted as deficient by her evaluators. Because Nigro's psychologist had determined that she was not depressed, the letter continued, the faculty had concluded that there was nothing treatable that would enable Nigro to succeed in the Program and that her deficient performance could be ascribed only to a disinterest in the practice of family medicine. Dennehy advised her that he would be willing to assist Nigro in obtaining a transfer to another residency program, but Nigro declined to accept the assistance.

Shortly after receiving the notice of non-renewal, Nigro contacted Mary Alice O'Donnell, Associate Dean and Director of Graduate Medical Education at VCU and the designated institutional officer of VCU residency programs. O'Donnell informed her that the proper course of action would be to appeal the notice of non-renewal to the GME. The GME was chaired by Dr. Terry Sinclair, a Valley Health official who served as VCU's designated institutional officer for the Program. Despite describing her difficulties with the Program to O'Donnell at length, Nigro did not claim to O'Donnell that she was suffering gender-based discrimination. (Nigro Dep. at 301.)

Upon Nigro's appeal of the faculty's notice of non-renewal, the GME appeals subcommittee rejected the faculty's decision and asked the faculty to give Nigro another chance at improvement. Two of the members of the committee voted to uphold the faculty's decision, but the other two—Drs. Parmar and Schiavone—believed that, based on her evaluations, non-renewal was not appropriate. The subcommittee did not offer a solution for how Nigro should

proceed in the Program, however, and instead asked the faculty for a recommendation on an alternative to non-renewal that wouldn't simply allow Nigro to continue to her R-2 year. Dennehy accordingly composed a memorandum on April 20, 2009, deciding that Nigro had not demonstrated the required competencies and could remain in the Program only on the condition that she be placed on probation for an entire year and repeat five rotations from her R-1 year: Obstetrics/Gynecology, NICU, Emergency Medicine, Internal Medicine, and Family Practice. Nigro had previously passed each of these rotations, and had passed with above average scores in Emergency Medicine and Family Medicine. This plan was never shown to or approved by the entire GME subcommittee.

On April 20, 2009, Sinclair and Dennehy informed Nigro of the proposed alternative to the non-renewal of her contract. Nigro asked Sinclair whether it would be possible for her to receive remedial instruction instead of being placed on probation, but Sinclair allegedly told her that "there were no other options and that he would look after [her] if [she'd] just be a nice little girl and [not] come out with [her] claws." (Nigro Dep. at 415.) Nigro agreed to the plan shortly thereafter and signed a "Corrective Action Form" which detailed the actions taken during her R-1 year.

On May 27, 2009, Nigro, by counsel, notified counsel for defendant Valley Health that she was being discriminated on the basis of gender, given that several male residents who were purportedly similarly situated to her had been promoted to the second year, including one resident who had been placed on probation twice during his R-1 year for behavioral and patient safety issues. Finally, on June 24, 2009, Nigro gave notice that she intended to resign from the Program, and she subsequently pursued administrative remedies with the EEOC. Her place in

10

the Program was filled by a female resident.

As these events were unfolding, Mary Harris, the Program Coordinator, told Kathleen Kagarise, Valley Health's Director of Human Resources, that Nigro had recorded some of her conversations with physicians at Prince William Hospital, where she was on rotation. Kagarise emailed Harris and Dennehy that Valley Health's policy prohibited Nigro from recording any conversations on Valley Health property. Ripley, the Program's Associate Director, informed Nigro of this policy in a subsequent email.

## Procedural History

Nigro filed the instant action on August 3, 2009. This court, by memorandum opinion dated June 4, 2010, dismissed most of Nigro's claims and several of the named defendants. The court's opinion left intact as to both Valley Health and the Hospital the portions of Count III which alleged that the emails generated by Ripley and Kagarise were defamatory. Nigro was also permitted to proceed on Counts VI and VII, which alleged disparate treatment and retaliation claims under Title VII of the 1964 Civil Rights Act ("Title VII") against VCU, Valley Health, and the Hospital (collectively, the "defendants").

VCU, Valley Health, and the Hospital filed motions for summary judgment on September 30, 2010. Nigro also filed a motion to strike the testimony of Dr. Medcalf, who the defendants had proferred as an expert witness. The court held a hearing on the parties' motions on November 12, 2010. The motions have been fully briefed and are now ripe for the court's disposition.

## The Defendants' Motions for Summary Judgment

An award of summary judgment is appropriate when "the pleadings, the discovery and

11

disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). For a party's evidence to raise a genuine issue of material fact to avoid summary judgment, it must be "such that a reasonable jury could return a verdict for the non-moving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). In making this determination, "the court is required to view the facts and draw reasonable inferences in a light most favorable to the nonmoving party." Shaw v. Stroud, 13 F.3d 791, 798 (4th Cir. 1994).

A party seeking summary judgment bears the initial burden of showing the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once the moving party has met that burden, however, the burden shifts to the nonmoving party to show that such an issue does, in fact, exist. See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986). The nonmoving party must set forth more than a "mere . . . scintilla of evidence" to forestall summary judgment. Anderson, 477 U.S. at 252. Thus, "unsupported speculation . . . is not sufficient to defeat a summary judgment motion." Ash v. United Parcel Service, Inc., 800 F.2d 409, 411-412 (4th Cir. 1986).

A.  **Title VII Claims**

1.  **Disparate Treatment**

Nigro first claims that the Program discriminated against her on the basis of her gender, in violation of Title VII. See 42 U.S.C. § 2000e-2(a). "Under Title VII, the plaintiff bears the initial burden of proving a prima facie case of discrimination by raising an inference that the defendant acted with discriminatory intent." Karpel v. Inova Health System Services, 134 F.3d 1222, 1227 (4th Cir. 1998). This can be accomplished either through direct evidence of

discriminatory intent, or by raising an inference of discriminatory intent via the four-part burden-shifting scheme adopted by the United States Supreme Court in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973).

Nigro does not claim that there is any direct evidence of discriminatory intent, and instead proceeds solely under the <u>McDonnell Douglas</u> burden-shifting scheme. "Absent direct evidence, the elements of a prima facie case of discrimination under Title VII are: (1) membership in a protected class; (2) satisfactory job performance; (3) adverse employment action; and (4) different treatment from similarly situated employees outside the protected class." <u>Coleman v. Maryland Court of Appeals</u>, — F.3d. —, 2010 WL 4486748, slip op. at *2 (4th Cir. Nov. 10, 2010) (citing <u>White v. BFI Waste Servs., LLC</u>, 375 F.3d 288, 295 (4th Cir. 2004)).

There is no serious dispute that Nigro has demonstrated that she is a member of a protected class or that she suffered an adverse employment action. As for the latter, Nigro essentially argues that she suffered from two adverse employment actions: the March 25, 2009 issuance of non-renewal of her contract, and the April 20, 2009 issuance of the probation notice, which required Nigro to repeat her R-1 year as a condition of continuing in the Program. Nigro maintains that the faculty, and especially Dennehy, were motivated by gender bias in the decision-making process.

In moving for summary judgment, the defendants focus on the second element required to establish a prima facie case—whether Nigro's job performance was satisfactory, and the fourth element—whether she was treated differently than other residents who were similarly situated. While the burden of establishing these elements is "not onerous," <u>Texas Dept. of Community Affairs v. Burdine</u>, 450 U.S. 248, 253 (1981), the court concludes that Nigro has failed to

demonstrate that her job performance was "satisfactory" as required by the second element and, thus, that she is unable to make out a prima facie case of discrimination.[5] See Coleman, — F. 3d at ___, 2010 WL 4486748 at *2.

In reaching this decision, the court first notes that it is undisputed that Nigro is required to establish that her job performance was satisfactory. Nigro conceded at oral argument that her disparate treatment claim must fail unless she demonstrates that she was qualified to advance to her R-2 year. See Sreeram v. Louisiana State University Medical Center-Shreveport, 188 F.3d 314, 320 (5th Cir. 1999); Herron v. Virginia Commonwealth University, 366 F. Supp. 2d 355, 364 (E.D. Va. 2004) (requiring that the plaintiff demonstrate that "she was qualified or otherwise meeting legitimate expectations for continued enrollment"). Cf. Anderson v. Westinghouse Savannah River Co., 406 F.3d 248, 268 (4th Cir. 2005) (requiring, in a case alleging wrongful failure to promote, that the plaintiff prove that she was qualified for the position she did not receive); Bryant v. Bell Atl. Md., Inc., 288 F.3d 124, 133 (4th Cir. 2002) (requiring a showing of satisfactory performance in a case alleging discriminatory discipline).

Having reviewed the record, the court is convinced that Nigro has failed to raise a genuine issue of material fact with respect to this element. The unavoidable fact is that the entire faculty believed that Nigro was not qualified to proceed to the second year of the residency. In response to this assessment of her proficiency, Nigro points to her passing grades; her positive, early evaluations; and the result of the GME appeals process as evidence that she was performing her job satisfactorily. For the reasons that follow, however, the court concludes that the evidence

---

[5] Having reached this decision, the court finds it unnecessary to address the issue of whether Nigro was treated differently than others who were similarly situated. Likewise, given the court's disposition of Nigro's disparate treatment and retaliation claims, the court finds it unnecessary to reach the question of whether VCU was Nigro's "employer" for purposes of Title VII.

cited by Nigro is not sufficiently probative to overcome summary judgment.

While Nigro first emphasizes that she received a passing grade in each particular rotation in which she participated during her first year, she fails to produce any evidence that demonstrates that she was performing satisfactorily with respect to the fundamental deficiencies cited by her evaluators within the Program. The faculty's stated reasons for non-renewing Nigro and subsequently placing her on probation were that they believed that she did not meet the ACGME competencies in that she possessed insufficient medical knowledge, lacked empathy, did not engage in self-learning, insufficiently prioritized patient care, and lacked a desire to remediate. Fundamentally, in the faculty's opinion, Nigro's unwillingness to heed constructive criticism, to admit that she had failings, or to initiate or demonstrate compliance with remedial opportunities manifested a questionable commitment to a competent practice of medicine.

Although Nigro also cites to various evaluations from early in her tenure with the Program that suggest she was motivated and self-directed, it is undisputed that Nigro initially refused to comply with the individual improvement plan that was crafted by Whisenant and reiterated by Dennehy at her semiannual performance review. When told to seek counseling and that she needed to learn how to better demonstrate empathy with patients and colleagues, Nigro said that she preferred to talk to her pastor instead, and refused to acknowledge that showing empathy was a problem for her. Nigro does not controvert the defendants' assertions that she was the only resident in the history of the Program to refuse to comply with a required individual improvement plan. Certainly, Nigro did undergo professional counseling later, but only after she was given absolutely no choice but to do so. There is no evidence in the record that she spoke with her pastor about her issues in the Program prior to the issuance of the letter of concern.

15

More to the point, it appears that it was the initial refusal itself that caused the faculty to question Nigro's commitment, given that, in their opinion, it was indicative of her refusal to remediate. In the faculty's opinion, her repeated denials cast serious doubt on her willingness to acknowledge her deficiencies and on her ability to acquire the degree of professional medical competence that could only be obtained and maintained through a self-initiated commitment to the practice of medicine and the health of her patients.[6] Once again, the simple fact is that the entire Program faculty unanimously voted, upon review of her evaluations and after seeking input from those who had worked with Nigro, that she was unfit to advance to her R-2 year.

In addition to her passing grades and her positive, early evaluations, Nigro cites the decision of the GME subcommittee as evidence that not all of her mentors deemed her unfit to continue. However, the court does not believe that the subcommittee's actions are in anyway availing, or demonstrative of any improper motivation on the part of Dennehy or the Program faculty. For instance, even the two members of the GME subcommittee—Parmar and Schiavone—whose input resulted in the subcommittee's decision to overturn Nigro's non-renewal, did not expressly opine that she should have advanced into the second year of the residency. While Parmar stated that he saw no reason for her to repeat certain residencies that she had passed as an R-1, he did not indicate to the other subcommittee members that he would not

---

[6]It should be noted that "ultimately, it is the perception of the decisionmaker which is relevant." Holland v. Washington Homes, Inc., 487 F.3d 208, 217 (4th Cir. 2007). For purposes of this inquiry, in other words, it doesn't matter whether Nigro was actually meeting the required competencies; the question is whether Dennehy and the rest of the faculty thought she was. Thus, the faculty's receipt of various second-hand or relatively-unsubstantiated reports is relevant to whether they were intentionally discriminating or, alternatively, acting on the basis of a possibly mistaken but non-discriminatory motive. Moreover, the mere fact that the evaluation of Nigro's desire to succeed is a subjective enterprise does not negate the fact that, if the faculty actually relied on this subjective finding from a motivation other than a discriminatory intent, Nigro's claim must fail. See DeJarnette v. Corning, Inc., 133 F.3d 293, 299 (4th Cir. 1998)( "[I]t is not our province to decide whether the reason was wise, fair, or even correct, ultimately, so long as it truly was the reason."); Evans v. Technologies Applications & Service Co., 80 F.3d 954, 960 (4th Cir. 1996) ("Job performance and relative employee qualifications are widely recognized as valid, non-discriminatory bases for any adverse employment decision.").

agree with the non-renewal decision. (Parmar Dep. at 58-59.) In fact, Parmar agreed with the subcommittee's consensus view that it would be inappropriate, given Nigro's demonstrated deficiencies, to "simply say that everything was fine and to continue on sort of as if nothing had happened." (Parmar Dep. at 27.) In Parmar's view, Nigro should not have been summarily non-renewed; but neither had she demonstrated that she was actually capable of performing at the R-2 level. (Parmar Dep. at 68.)

Schiavone likewise never claimed that Nigro should have advanced into her second year. Although he clearly stated that he "saw no reason for her not to continue," he also was careful to observe that he reached this conclusion solely by virtue of his own interactions with Nigro and by reviewing Nigro's evaluations. (Schiavone Dep. at 20, 55.) Schiavone clearly believed that the GME subcommittee served in only an advisory role to the faculty's non-renewal decision and that the entire calculus regarding the retention of a resident involved much more than simply tallying the number of rotations that a resident had passed: "I still don't necessarily know how [the retention or release of a resident] occurs. . . . [T]here are, apparently, other things that come into that decision." (Schiavone Dep. at 24.) Although Schiavone knew that the ACGME competencies served as a basis for making non-renewal decisions, he admitted that he could not say whether Nigro had achieved all of the competencies because he did "not have a working knowledge of what the competencies are." (Schiavone Dep. at 51, 55.) While Schiavone's assessment of Nigro's capabilities and/or potential may have been somewhat greater than that of his colleagues, his endorsement of the subcommittee's consensus decision demonstrates that he did not support the notion that she should advance to the second year as if nothing had happened.

Moreover, while the court recognizes that the professional appraisal of Nigro's attitude adjustment involves a degree of subjective assessment, this is exactly the type of training program in which substantial deference must be accorded to the assessment of the professionals by whom Nigro was being trained. See Wesley v. Arlington County, 354 F. App'x 775, 779 (4th Cir. 2009) (per curiam) (unpublished) (declining to adopt a bright-line rule preventing employers from using subjective qualifications in establishing the requirements of a job). Numerous courts adjudicating discrimination claims within an educational context have expressed hesitation in substituting their judgment for that of professional educators. For example, in Shin v. University of Maryland Medical System Corp., 369 F. App'x 472 (4th Cir. 2010) (unpublished), the plaintiff alleged he was terminated from a medical internship without being given reasonable accommodations under the ADA for his narcolepsy and attention deficit disorder. The Court affirmed the trial court's grant of summary judgment on the ground that the plaintiff had failed to demonstrate that he could perform the essential functions of the job with the particular accommodation he requested—a reduced patient load. Inasmuch as the plaintiff had shown no evidence to controvert the internship program's assertion that "[g]iven that the goals of residency training are to develop competency, the doctor must function at a level allowing complex problem solving including simultaneously managing multiple patient care situations and dealing with ambiguity," the Court stated that it would "defer to the views of Appellees on the standards for professional and academic achievement." Id. at 482. The Court held that "[n]o reasonable jury could conclude that a reduced patient load was a reasonable accommodation under these circumstances." Id. See also Zukle v. Regents of University of California, 166 F.3d 1041, 1047 (9th Cir. 1999) ("[A] majority of circuits have extended judicial deference to an educational

institution's academic decisions in ADA and Rehabilitation Act cases."); Doe v. Univ. of Md. Med. Sys. Corp., 50 F.3d 1261, 1266 (4th Cir. 1995) ("We are reluctant under these circumstances to substitute our judgment for that of UMMSC.").

As the United States District Court for the Eastern District of Virginia has observed in a similar context, "[w]hile a plaintiff is entitled to establish by showing disparate treatment that illegal discriminatory animus was the basis for an adverse action, administrators of professional schools are entitled to deference in their decisions to admit, retain, or dismiss a student when such evidence is lacking." Herron, 366 F. Supp. 2d at 368 n. 16 (granting summary judgment against a plaintiff who claimed that she had been terminated from a nurse anesthetist program because of her race). Nigro was, of course, paid for her participation in the Program. But, much like a graduate student, she primarily sought to participate in the medical residency for its promise of professional medical training, rather than for the monetary compensation that was incident to her tenure there. The application of Title VII to Nigro's case must therefore be refracted accordingly. See Bucklen v. Rensselaer Polytechnic Institute, 166 F. Supp. 2d 721, 725-726 (N.D. N.Y. 2001) (dismissing a graduate student's Title VII claim as alleging discrimination against him only in his role as a student rather than in his role as an employee when he complained that the Institute had not given him the same opportunities to pass his oral examinations as it had given a female student, causing him to be terminated from the program); Stilley v. University of Pittsburgh of Com. System of Higher Educ., 968 F. Supp. 252, 261 (W.D. Pa. 1996) (refusing to analyze the issues pertaining to the completion of the plaintiff's dissertation, which she alleged she had to abandon due to her advisor's gender-based harassment). Further, to the extent that evaluating the competency of a medical resident is at least

partially akin to evaluating the competency of other highly-specialized professionals, the court acknowledges that "[d]eterminations about such matters as teaching ability, research scholarship, and professional stature are subjective, and unless they can be shown to have been used as the mechanism to obscure discrimination, they must be left for evaluation by the professional, particularly since they often involve inquiry into aspects of arcane scholarship beyond the competence of individual judges." Jiminez v. Mary Washington College, 57 F.3d 369, 377 (4th Cir. 1995).

In this vein, the court finds guidance in the decision of the United States Court of Appeals for the Fifth Circuit in Sreeram v. Louisiana State University Medical Center-Shreveport, 188 F.3d 314 (5th Cir. 1999), which involved circumstances similar to those in the case at bar. There, a female medical resident of Indian ethnic origin was non-renewed from her residency program between her R-2 and R-3 year. Id. at 316. The program's faculty claimed that it based its decision on Sreeram's difficulty in managing her patients and in applying her medical knowledge when diagnosing her patients. Id. Sreeram demonstrated, however, that several faculty had made comments about the "good old boys" in the residency and had expressed scepticism of women who entered surgical residencies; that the program had retained a white male resident even though he scored lower on in-service training and was ranked lower than the plaintiff; and that only six of the ninety-nine residents who had trained in the program during the prior ten years were women and that only two of those six had completed the program. Id. at 320. Still, in reviewing the trial court's entry of summary judgment, the Fifth Circuit held that Sreeram had "failed to establish a prima facie case of sex and/or national origin discrimination because she failed to establish that she was qualified for the position in question at all relevant times." Id. at

318. The Court stressed the fact that "[e]very doctor to evaluate Dr. Sreeram found that her

performance as a surgeon was insufficient to allow her to continue in the program." Id. Even

taking into consideration Sreeram's above-average academic qualifications, the Court observed

that "there remains a chorus of bad reviews by faculty and other residents regarding whom there

was no evidence of discriminatory motive and which is unrebutted by a single positive

testimonial on Dr. Sreeram's behalf." Id. at 319. The Court also noted that it had good reason to

defer to the faculty's assessment of subjective factors such as Sreeram's "confidence":

> [I]t is one thing to test well, quite another to perform when life is literally on the
> line. At issue in establishing Dr. Sreeram's qualifications to enter into a fourth
> year residency was whether Dr. Sreeram had the clinical ability and confidence to
> apply her objective knowledge and take on increased responsibility within the fast
> paced realities of administering medical care to actual patients. The objective
> qualifications noted by Dr. Sreeram merely demonstrate that her knowledge and
> intelligence were sufficient. Therefore, such objective qualifications cannot, by
> themselves, overcome the evidence of Dr. Sreeram's inability to apply her
> knowledge in managing a large number of patients or her apparent lack of
> confidence to make a rapid diagnosis.

Id. at 319-20. Accordingly, the court held that summary judgment was properly entered on

Sreeram's Title VII claim because "even when viewing the evidence in the light most favorable

to Dr. Sreeram, the record cannot support a finding that she was qualified to continue as a third

year resident." Id. at 319.

Nigro's circumstances are, if anything, much less likely to form the basis of a Title VII

claim than those confronting the plaintiff in Sreeram. As indicated previously, Nigro has failed to

provide objective evidence in retort to the unanimous sentiment in the Program that, at the very

least, she was not prepared to advance to the second year of the residency. See Herron, 366 F.

Supp. 2d at 367-68 (holding that the plaintiff had failed to demonstrate illegal bias on the part of

the defendant because, in part, "the Plaintiff was failing her clinical rotation and the evidence is

clear that although she was repeatedly apprised of her shortcomings by clinical supervisors, she refused to listen to or integrate their feedback.").

The record in the instant case is also utterly devoid of evidence of any gender-based animus with respect to the faculty members, each of whom voted to non-renew her contract. Cf. Sreeram, 188 F.3d at 319. Nigro points only to Dennehy as possessing a gender bias, claiming that such bias is evidenced by an isolated comment that he made about her husband having to make sacrifices because of her career choice and by Dennehy's purportedly dismissive attitude toward sexual harassment complaints about other residents.[7] However, Dennehy and the faculty were the very individuals who hired Nigro less than a year before they non-renewed her, giving rise to a "strong inference" that their stated reason for acting adversely to Nigro was not a guise for illegal discrimination. Proud v. Stone, 945 F.2d 796, 798 (4th Cir. 1991). Moreover, Nigro's theory of the case depends upon the unlikely scenario that gender bias played no role in Dennehy's conduct prior to February 4, 2009, when he gave Nigro a favorable semiannual evaluation, but that it sprang into action two days later, when he added an unfavorable addendum to Nigro's evaluation.

Even if Nigro has raised a genuine issue of material fact regarding Dennehy's purported bias, this showing would not be enough to demonstrate that the Program's entire faculty was riddled with gender bias. See Johnson v. Baptist Medical Center, 97 F.3d 1070, 1073 (8th Cir. 1996) (holding that a medical resident's claims that her supervising doctor was judgmental toward female residents but patient with male residents, that another female resident had felt

---

[7]It is worth noting that in one of the incidents of which Dennehy was purportedly dismissive, the offending resident was immediately placed on probation—a permanent demerit on his professional record—despite the fact that the incident occurred only two months into his first year with the Program.

unfairly judged by him, that he had criticized a female resident at one point, and that another male doctor made some disparaging comments about a female resident, were incidents "insufficiently serious to raise an inference of animus on the part of BMC generally"). Although Dennehy was the Director of the Program, he requested the input of each faculty member on the non-renewal decision. (Dkt. No. 121-104.) Each faculty member recommended that Nigro be non-renewed, and Nigro has produced no evidence that any of them made misogynist or gender-insensitive remarks. (Dkt. No. 121-104.) A number of the faculty members were women themselves. In fact, the other female resident in Nigro's class was successfully promoted to R-2 status. (Nigro Dep. at 188.) Moreover, the resident who was selected by the faculty to replace Nigro was female, and the Program has evaluated her very highly. (Dennehy Dep. at 23). Finally, nearly fifty percent of the Program's residents in the last five years were female. (Dennehy Aff. at ¶ 7.) Of the ten residents who have not graduated with their class, five were male, and five were female. (Dennehy Aff. at ¶ 7.) There is thus absolutely no evidence that the entire faculty was motivated by a gender-based animus in the decision to non-renew Nigro or place her on probation after her successful appeal.

Of course, none of the foregoing is to suggest that the Program's professional decisions are utterly insulated from the mandate of Title VII. The court recognizes that a blind acceptance of the defendants' assertion that a resident is deficient risks begging the question. See Wesley, 354 F. App'x at 780; Herron, 366 F. Supp. 2d at 367. But in the absence of any objective evidence suggesting that a resident is actually performing satisfactorily in the particular areas deemed problematic by the evaluating faculty, a Title VII claim cannot stand. See Sreeram, 188 F.3d at 320. Cf. Wesley, 354 F. App'x at 779 ("By all accounts, Wesley met the minimum

objective criteria to be eligible for promotion to the rank of Captain."). In the instant case, Nigro has produced no evidence contradicting the faculty's unanimous assessment that she possessed insufficient medical knowledge, insufficiently prioritized patient care, lacked a desire to remediate, and ultimately lacked the requisite commitment to the practice of medicine.[8] She has, accordingly, simply generated no genuine issue of fact regarding her qualifications to proceed to her R-2 year.

The court reaches this conclusion mindful of its obligation to construe the facts in the manner most favorable to the plaintiff and aware that it must not substitute its own judgment for that of the jury. To be sure, the facts, read in the light most favorable to the plaintiff, produce somewhat of a specter: it is not at all clear that Nigro was treated altogether fairly throughout her ordeal.[9] But it is patent that, rightly or wrongly, the entire faculty deemed Nigro unqualified for the R-2 position she sought, and she has not rebutted this determination by a showing that she

---

[8] Again, while Parmar and Schiavone indicated that Nigro appeared to demonstrate the requisite motivation and skills during the particular rotations in which they supervised her, Nigro has not identified any reason to believe that they or any other individual would conclude that her overall performance justified promotion to R-2 status when considering her entire record.

[9] It is arguable that the evidence suggests that certain of the decision-makers became dissatisfied with Nigro for totally unrelated reasons. As noted above, Nigro questioned Dennehy regarding the ACGME survey and the Program was later cited for ACGME hours violations. The faculty, including Dennehy, suspected that Nigro had reported that she had worked in excess of the work hours permitted under ACGME standards. The faculty voted to non-renew Nigro's contract in the same meeting that they discussed the fact that the Program had been reported as violating work hour standards. (Dkt. No. 121-104.) In fact, on March 24, 2009—the day before Nigro's contract was non-renewed—Ripley allegedly made inquiries of Nigro to ascertain whether she had reported working an excess number of hours in violation of ACGME regulations. (Complaint at ¶ 23.)

Moreover, during discovery, Nigro gained insight about a male resident who was disciplined due to behavioral and anger-management problems. Whereas the male resident was placed on probation, Nigro was simply non-renewed without being offered probation as a chance to remediate her deficiencies. While such evidence may suggest that Nigro's punishment was unfair, it is not probative of whether Nigro was performing in a satisfactory manner. Without such proof, Nigro cannot prevail under Title VII. See Young v. Edgcomb Steel Co., 499 F.2d 97, 98 (4th Cir. 1974) (racial discrimination case) (emphasizing that Title VII "does not demand that an employee be placed [or remain] in a position for which [she] is not qualified").

was adequately performing in the areas of her stated deficiencies. Thus, Nigro has not passed the threshold analysis of the prima facie case; she has produced no evidence that would enable a reasonable jury to determined that she was qualified to advance to her R-2 year, regardless of the particular motive animating the decision-makers in her case. See Sreeram, 188 F.3d at 320 ("Since none of the evidence demonstrates Dr. Sreeram's ability to perform under the rigorous conditions of third year residency, she has failed to establish that she was qualified. We therefore find that Dr. Sreeram failed to establish a prima facie case of discrimination.").

Finally, even if the Program was improper and unfair in its treatment of Nigro, there is absolutely no evidence of a discriminatory animus on the part of the relevant decision-makers. Simply put, the court cannot conclude that a reasonable jury could find that gender motivated the Program's adverse decisions with respect to Nigro. In fact, Nigro herself never claimed that she was a victim of gender bias from January to May of 2009, despite her opposition to the Program's decisions at each step in the process. Indeed, her original theory of the case centered on the fact that the Program had treated her unfairly because she reported that she had worked excess hours in violation of ACGME standards; only later did she assert that she was a victim of gender discrimination. It is fundamental, though, that Title VII "is not a statute intended to police standards of general fairness in the workplace, or even to protect against the firing of an employee in order to cover up wrongdoing by an employer. If it were interpreted in such an omnibus fashion, it would dilute the noble purposes for which Congress enacted it." Lightner v. City of Wilmington, N.C., 545 F.3d 260, 262 (4th Cir. 2008). For these reasons, the court concludes that the defendants are entitled to summary judgment on Nigro's disparate treatment claim.

## 2.   **Retaliation**

Nigro also claims that the defendants violated Title VII by treating her adversely in retaliation for her gender discrimination complaint. See 42 U.S.C. § 2000e-3(a). In order to establish a claim of retaliation, "a plaintiff must show that he opposed an unlawful employment practice or participated in a charge or other proceeding under Title VII; that he has suffered an adverse employment action; and that there is a causal connection between the two." Balazs v. Liebenthal, 32 F.3d 151, 158 (4th Cir. 1994). See also E.E.O.C. v. Navy Federal Credit Union, 424 F.3d 397, 406 (4th Cir. 2005). With respect to the second element, the adverse employment action need not be so severe as to constitute prohibited discriminatory conduct in its own right. Burlington N. & Sante Fe Ry. Co. v. White, 548 U.S. 53, 67 (2006). Rather, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." Id. at 68 (citations and quotations omitted).

Nigro argues that the following adverse actions occurred: (1) a "sham" evaluation, dated June 4, 2009, was prepared by Whisenant; (2) Whisenant excessively monitored Nigro's activities and made misrepresentations regarding her treatment of patients; (3) Dennehy and Ripley disseminated throughout the hospital Nigro's decision to challenge the Program's determination to deny her entry to the second year of residency and portrayed her in a negative light; (4) Wheat, who had formerly given Nigro positive evaluations, gave her a very negative evaluation for the time period of May 1 to May 31, 2009; and (5) Nigro's cumulative evaluation by the faculty on August 28, 2009, represented dramatically lower performance scores than her semiannual evaluation in February.

Nigro's retaliation claim, however, is belied by the timing of her discrimination charge. Although "it is not necessary that the plaintiff prove that the underlying claim of discrimination was true," Balazs, 32 F.3d at 158, "the employer's knowledge that the plaintiff engaged in a protected activity is absolutely necessary to establish the third element of the prima facie case." Dowe v. Total Action Against Poverty in Roanoke Valley, 145 F.3d 653, 657 (4th Cir. 1998). Even though Nigro's counsel orally notified counsel for Valley Health on May 27, 2009 that there was evidence that Nigro was being discriminated against on account of her gender, there is no serious dispute that neither VCU nor the particular members of the Program's faculty knew that she was proceeding upon a gender discrimination theory until receiving written notice of her intention to quit the Program and commence suit on June 24, 2009. In fact, there is no evidence that any of the faculty knew until that date—six days before the end of her tenure with the Program—that she intended to press a legal claim of any sort against the Program. At best, they simply knew that she had hired an attorney to advise her with regard to the non-renewal decision.

There is, moreover, no evidence that any adverse action at all was taken against Nigro in her final week with the Program, after her gender discrimination concerns were made known. While Nigro suggests that she underwent "increased monitoring" during this period, she has failed to present any evidence that she was treated in any manner disproportionately greater than that warranted by her probationary status during this short period. See Clark County School Dist. v. Breeden, 532 U.S. 268, 272 (2001) (no inference of causal connection can be drawn where the adverse employment actions were already being contemplated—even if not definitively determined—before the employer received notice of the plaintiff's opposition to an allegedly unlawful employment practice). In the absence of any indication that the decision-makers were

aware that Nigro had made a gender discrimination complaint, it is apparent that each of the adverse actions otherwise cited by Nigro is not causally related to her charge of gender discrimination. Accordingly, her retaliation claim cannot stand.

B.    **Defamation Claim**

Nigro's state law defamation claims are leveled only against Valley Health and the Hospital. She claims that two of the statements made in connection with her wranglings with the Program were defamatory. First, after Mary Harris, the Program Coordinator, informed Kathleen Kagarise, Valley Health's Director of Human Resources, that Nigro had told Harris that she had been recording conversations, Kagarise emailed Harris and Dennehy on April 3, 2009, stating, "C. Nigro must discontinue recording anytime she is in the VH areas. [S]he needs to be warned that if she continues with recording conversations, etc. that she will be subject to termination." Dennehy forwarded this email to Nigro, who replied, "Thank you for the warning. Please note, I have not been recording on VH areas and nor do I intend to record." Second, Ripley wrote Nigro on April 3 in an email copied to the Program's administrative staff, stating that, "We have been notified by Valley Health Personnel that conversations should not be tapped [sic] on Valley Health Property without the consent of both parties."

Virginia law, which governs Nigro's defamation claim, applies a qualified privilege to allegedly defamatory statements made between persons "on a subject in which they have an interest or duty." See Larimore v. Blaylock, 528 S.E.2d 119, 121 (Va. 2000). To overcome the qualified privilege, the plaintiff must establish, by clear and convincing evidence, that the defendant acted with common law malice – that is, out of "personal spite, or ill-will, independent of the occasion on which the communication was made." Gazette, Inc. v. Harris, 325 S.E.2d

713, 727 (Va. 1985). See also Smalls v. Wright, 399 S.E.2d 805, 808 (Va. 1991).

Here, the statements at issue were both made between Valley Health's human resources department and the administrative staff of the Program—each of whom had an interest and duty in ensuring that residents complied with Valley Health policy. The parties do not dispute that the statements at issue are thus protected by a qualified privilege.

Unfortunately for Nigro, she has failed to forecast evidence that would establish that the statements were made with common law malice such as to overcome the qualified privilege. At the very best, Nigro identifies only Mary Harris as evidencing any type of malice inasmuch as she told Kagarise that Nigro was tape recording only days after Harris had learned that Nigro had filed a grievance against Dennehy, Harris' boss. However, Nigro is unable to offer any evidence of ill-will on behalf of either of the actual speakers—Ripley or Kagarise. There is no evidence to suggest that either of these individuals acted with "such gross indifference and recklessness as to amount to a wanton or wilful disregard of the rights of the plaintiff." Southeastern Tidewater Opportunity Project, Inc. v. Bade, 435 S.E.2d 131, 133 (Va. 1993). Nor has Nigro forecast clear and convincing evidence that either Ripley or Kagarise included the statements in their emails "without believing them to be true, or lack[ing] reasonable or probable grounds for believing them to be true." Great Coastal Express v. Ellington, 334 S.E.2d 846, 854 (Va. 1985). On the contrary, all of the evidence suggests that both Kagarise and Ripley were genuinely concerned by second-hand reports that Nigro had been tape-recording conversations without consent and attempted to speedily apprise her of the relevant policies that prohibited such conduct. Because there is no evidence of ill will or malice on the part of either Kagarise or Ripley, their statements are subject to a qualified privilege and, thus, Nigro's defamation claim fails.

## Conclusion

For the foregoing reasons, the defendants' motions for summary judgment will be granted.[10] Given this disposition on the merits of her claims, Nigro's motion to strike the defendants' proferred expert witness will be dismissed as moot.

The Clerk is directed to send certified copies of this order to all counsel of record.

ENTER: This _23rd_ day of November, 2010.

_____
Chief United States District Judge

---

[10] To the extent VCU alternatively sought dismissal of the plaintiff's Title VII claims on the jurisdictional basis that it was not Nigro's "employer," such motion will be dismissed as moot.